1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CARL WICKLUND,

11           Plaintiff,              No. 2: 10-cv-2161 JAM KJN P

12      vs.

13   QUEEN OF THE VALLEY
     MEDICAL CENTER, at al.,         ORDER AND
14
             Defendants.            FINDINGS AND RECOMMENDATIONS
15
     _____/
16

17   I.  Introduction

18           Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action

19   pursuant to 42 U.S.C. § 1983.  Pending before the court is the December 28, 2011 summary

20   judgment motion filed by defendants Queen of the Valley Medical Center and NorthBay

21   Healthcare ("NorthBay").

22           On May 31, 2012, the undersigned recommended that defendants' summary

23   judgment motion be granted.  On July 19, 2012, the undersigned vacated these findings and

24   recommendations and gave plaintiff notice of the requirements for opposing a summary

25   judgment motion pursuant to Woods v. Carey, 2012 WL 2626912 (9th Cir. July 6, 2012).  The

26   July 19, 2012 order gave plaintiff the option of filing a new opposition, a supplemental

1

opposition or a statement that plaintiff chose to rely on his previously filed opposition.  On

August 13, 2012, plaintiff filed a statement stating that he intended to rely on his previously filed

opposition.

For the following reasons, the undersigned recommends that defendants' summary

judgment motion be granted.

II. <u>Legal Standard for Summary Judgment</u>

Summary judgment is appropriate when a moving party establishes that the

standard set forth in Federal Rule of Civil Procedure 56(c) is met.  "The judgment sought should

be rendered  if . . . there is no genuine issue as to any material fact, and that the movant  is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

file.'"  <u>Id.</u>  Indeed, summary judgment should be entered, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at

trial.  <u>See id.</u> at 322.  "[A] complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u> at 323.  In such a

circumstance, summary judgment should be granted, "so long as whatever is before the district

court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

satisfied."  <u>Id.</u>

////

1      If the moving party meets its initial responsibility, the burden then shifts to the

2   opposing party to establish that a genuine issue as to any material fact actually exists.  See

3   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

4   establish the existence of such a factual dispute, the opposing party may not rely upon the

5   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

6   form of affidavits, and/or admissible discovery material, in support of its contention that the

7   dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

8   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

9   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

10  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

11  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

12  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

13  1436 (9th Cir. 1987).

14      In the endeavor to establish the existence of a factual dispute, the opposing party

15  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

16  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

17  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

18  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

19  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

20  committee's note on 1963 amendments).

21      In resolving a summary judgment motion, the court examines the pleadings,

22  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

24  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

25  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

26  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

III.  Discussion

    A.  Plaintiff's Claims

        This action is proceeding on the amended complaint filed October 13, 2010. (Dkt. No. 10.)  Plaintiff alleges that in 2005, he began experiencing chest pain.  Plaintiff alleges that for the next few years, he continued to suffer from chest and lung pain.  Plaintiff alleges that on May 4, 2009, he was taken to Vaca Valley Hospital because he suffered a heart attack. Plaintiff alleges that seven days later, he was taken to defendant Queen of the Valley Hospital where he underwent an angioplasty.  Plaintiff alleges that the angioplasty resulted in damage to plaintiff's heart that forced doctors to perform an emergency by-pass operation.

        Plaintiff alleges that on September 28, 2009, he was taken to defendant Northbay where a pace-maker was installed in his chest.  Plaintiff allegedly did not know what procedure was being performed until after the surgery.

        Plaintiff alleges that defendant Queen of the Valley Hospital has a policy of having unqualified surgeons perform surgery on inmates.  Plaintiff alleges that he suffered injuries as a result of this policy following his angioplasty and emergency by-pass surgery. Plaintiff alleges that defendant Northbay has a policy of allowing doctors to perform experimental or unnecessary surgery.  Plaintiff alleges that he was injured as a result of this policy because the installation of his pacemaker was unnecessary and has made his life-threatening condition more severe.

////

        B. <u>Undisputed Facts</u>

        Defendants' summary judgment motion contains a statement of undisputed facts.

Plaintiff's opposition is not verified, nor does it contain a statement of undisputed facts.

Plaintiff's opposition also does not include any evidence.  To the extent appropriate, the

undersigned considers plaintiff's verified amended complaint in determining the undisputed and

disputed facts.  <u>See</u> <u>Schroeder v. McDonald</u>, 55 F.3d 454, 460 & nn.10–11 (9th  Cir. 1995)

(treating plaintiff's verified complaint as opposing affidavit where, even though verification not

in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were

true and correct, and allegations were not based purely on his belief but on his personal

knowledge).

        *Defendant Queen of the Valley Hospital Policies*

        The physicians and surgeons who provided patient care at defendant Queen of the

Valley Hospital are independent contractors.  (Dkt. No. 27-4 at 49.)  Before a physician can

admit and treat a patient at defendant Queen of the Valley Hospital, he or she must apply for and

be granted staff privileges.  (<u>Id.</u>)

        When a physician applies for staff privileges at defendant Queen of the Valley

Hospital, they are subjected to the credentialing process set forth in defendant's bylaws.  (<u>Id.</u>)

All applications for medical staff at defendant Queen of the Valley Hospital are reviewed by the

Credentials Committee, the Medical Staff Executive Committee ("MSEC"), and defendant's

Board of Trustees.  (<u>Id.</u>)  Upon receipt of an application, the Credentials Committee examines the

character, professional competence, malpractice history, qualifications and ethical standing of the

physician who is applying for staff privileges.  (<u>Id.</u>)  The Credentials Committee then transmits to

the MSEC the completed application and a recommendation as to whether the physician should

be granted privileges.  (<u>Id.</u>)  The MSEC then reviews the recommendations of the Credentials

Committee and determines whether to recommend to the Board of the Trustees that the physician

receive staff privileges.  (<u>Id.</u> at 49-50.)  If the MSEC issues a favorable recommendation, and the

1 | Board of Trustees concurs, then the physician will be granted staff privileges.  (Id. at 50.)

2 |    In order to obtain staff privileges at defendant Queen of the Valley Hospital, the

3 | physician must demonstrate that he is a professionally competent practitioner who continuously

4 | meets the qualifications, standards and requirements set forth in the bylaws.  (Id.)  In particular,

5 | the practitioner must be licensed to practice as a physician in the State of California, must

6 | document their background, experience, training and demonstrated competence, their adherence

7 | to the ethics of the profession, their good reputation, their physical and mental health, and their

8 | ability to work with others.  (Id.)

9 |    Defendant Queen of the Valley Hospital carries out periodic re-credentialing of

10 | clinical privileges.  (Id.)

11 |    Dr. Dassah is a cardiologist who had staff privileges to admit and treat patients

12 | under his care at defendant Queen of the Valley Hospital in May 2009.  (Id. at 51.)  Dr. Dassah's

13 | privileges as of May 2009 at defendant Queen of the Valley Hospital extended to the treatment of

14 | all of his patients, including but not limited to inmates of the California Department of

15 | Corrections and Rehabilitation ("CDCR"), with whom he had a contract.  (Id.)

16 |    Before being granted staff privileges at defendant Queen of the Valley, Dr. Dassah

17 | went through the same credentialing process as all other physicians seeking staff privileges, and

18 | it was determined that he met all the necessary qualifications, standards and requirements, and

19 | was subject to the periodic re-credentialing process.  (Id.)

20 |    Dr. Srebro is a cardiologist who had staff privileges to admit and treat patients,

21 | including CDCR inmates, under his care at defendant Queen of the Valley Hospital in May 2009.

22 | (Id.)  Dr. Deeik and Dr. Klingman also had staff privileges to admit and treat patients, including

23 | CDCR inmates, under their care at defendant Queen of the Valley Hospital in May 2009.  (Id.)

24 | Dr. Srebo, Dr. Deeik and Dr. Klingman went through defendant Queen of the Valley Hospital's

25 | credentialing process before being granted staff privileges.  (Id.)

26 | ////

1    Defendant Queen of the Valley does not have a policy that permits physicians

2  with staff privileges to provide medical care to patients, including CDCR inmates, that falls

3  below the professional standard of care.  (Id.)

4               *Defendant NorthBay Policies*

5    Defendant Northbay is a non-profit healthcare organization that operates hospital

6  facilities and provides personnel to assist physicians and surgeons in the treatment of their

7  patients.  (Dkt. No. 27-5 at 14.)  All physicians and surgeons furnishing services to patients at

8  defendant NorthBay's hospitals are independent contractors.  (Id.)

9    Before a physician or surgeon can admit and treat his or her patients at defendant

10  NorthBay's hospitals, he or she must apply for staff privileges.  (Id.)  Defendant NorthBay,

11  through its medical staff, fully evaluates all physicians and surgeons who have applied or re-

12  applied for staff privileges before granting any such privileges to them.  (Id.)  Defendant

13  NorthBay only extends staff privileges to professionally competent practitioners who

14  continuously meet the necessary qualifications, standards and requirements.  (Id.)  Practitioners

15  must be licensed to practice as physicians in the State of California, must document their

16  background, experience, training, demonstrate competence both in general and as to specified

17  invasive procedures, and demonstrate their adherence to the ethics of the medical profession and

18  be of sound mental and physical health.  (Id. at 14-15.)

19    Dr. Dassah is a physician who has staff privileges to admit and treat patients at

20  defendant NorthBay's hospitals.  (Id. at 15.)  Dr. Dassah's privileges at defendant NorthBay

21  extend to the treatment of all of his patients, including inmates of the CDCR, with whom he had

22  a contract at the time in question.  (Id.)

23    Before being granted staff privileges, Dr. Dassah was subjected to the same

24  credentialing process as all other physicians seeking staff privileges, and it was determined that

25  he met all the necessary qualifications, standards and requirements.  (Id.)

26  ////

1      Defendant NorthBay does not have any policies that permit its independent

2   contractor physicians to perform unnecessary surgeries.  (Id.)  Experimental surgeries can only be

3   performed after the Institutional Review Board reviews and approves the proposed procedures.

4   (Id.)

5      Defendant NorthBay participates with other hospitals, schools and public agencies

6   in the training of health care professionals.  (Id.)  This participation is undertaken by defendant

7   NorthBay as part of its commitment to serve the long-term health care needs of the community.

8   (Id.)  Medical students and physicians in residency programs at times provide care to patients

9   hospitalized at defendant NorthBay under the supervision of a licensed health care professional.

10   (Id.)  However, any such student or resident care is only provided if the patient first provides his

11   written consent.  (Id.)

12      No medical students or residents participated in or observed the catheterization

13   and implantable cardioverter-defibrillator implantation which Dr. Dassah performed on plaintiff

14   on September 28, 2009, and February 26, 2010, respectively.  (Id. at 16.)

15      *Plaintiff's Treatment*

16      On May 5, 2009, plaintiff was admitted to Vaca Valley Hospital emergency

17   department after he suffered a heart attack.  (Dkt. No. 27-4 at 55.)  Plaintiff was transferred to the

18   Intensive Care Unit ("ISU") where he had an episode of nonsustained ventricular tachycardia

19   (fast heart rhythm which self-terminates within 30 seconds).  (Id.)  In order to evaluate plaintiff's

20   cardiac function, plaintiff underwent an echocardiogram (sonogram of the heart) which

21   demonstrated an ejection fraction (percentage of blood pumped out of a filled ventricle with each

22   heartbeat) in the left ventricle of approximately 45%.  (Id.)  It was suspected that plaintiff may

23   have an underlying fixed lesion.  (Id.)  In order to identify and manage his condition, it was

24   thought that plaintiff may benefit from cardiac catheterization (insertion of catheter into chamber

25   or vessel of the heart).  (Id.)

26   ////

On or about May 8, 2009, plaintiff was admitted to defendant Queen of the Valley Hospital where Dr. Dassah would perform the cardiac catheterization.  (Id. at 56).  On May 10, 2009, plaintiff consented to having cardiac catheterization with possible percutaneous coronary intervention or angioplasty.  (Id. at 85-86 (plaintiff's signed consent form).)

On May 10, 2009, Dr. Dassah performed the cardiac catheterization.  (Id. at 55.) The left catheterization study revealed that plaintiff's right coronary artery had 90% proximal stenosis (when an artery is severely narrowed).  (Id.)  The area had significant tortuosity (twists and turns) and percutaneous coronary intervention, and angioplasty (nonsurgical procedure used to restore blood flow to narrowed arteries) would be difficult.  (Id.)

Angioplasty is indicated on patients with unstable or coronary disease and who have a single vessel coronary artery blocked.  (Id.)  The procedure is performed by feeding a small balloon through blood vessels to the point of the blockage.  (Id.)  The balloon is then inflated to open the artery.  (Id.)  If necessary, a stent (wire mesh tube) is inserted and left to keep the artery from closing up again.  (Id.)

Shortly thereafter, on May 10, 2009, Dr. Dassah performed a coronary angiography (test using dye and special x-rays to show the inside of the coronary arteries), which revealed a single coronary artery blocked.  (Id.)  Therefore, Dr. Dassah proceeded with balloon angioplasty on plaintiff.  (Id.)  The guided catheter, wire and balloon were inserted into the right coronary artery, but with extreme difficulty due to the tortuosity of the vessel.  (Id.)  Insertion of the stent past the guiding catheter was attempted, but was unsuccessful due to the tortuous vessel. (Id. at  56-57.)  Plaintiff's right coronary artery suffered a spiral dissection in the tortuous area of the artery, which is a known complication.  (Id. at 57.)  Because of the complicated procedure, Dr. Dassah contacted cardiologist Dr. Srebro to assist him with inserting the wire beyond the tortuous area.  (Id.)

Dr. Srebro attempted a series of manipulations to open the vessel.  (Id.)  However, the stent could not be successfully placed because the vessel was "corkscrew" with "multiple

9

tortuousities" and many "bends, twists and turns" in multiple locations.  (Id.)  Dr. Dassah and Dr.
Srebro decided that further attempts to insert the stent would not be appropriate because plaintiff
was stable and the vessel resisted intervention.  (Id.)  At the conclusion of the surgery, the vessel
was patent (open) and appropriate blood flow was present.  (Id.)  Plaintiff was transferred to the
ICU in a stable position.  (Id.)

On May 11, 2009, Dr. Dassah and Dr. Srebro determined that plaintiff was still
having chest pain and that bypass surgery would be the safest  method for re-establishing
adequate coronary bloodflow.  (Id.)  Plaintiff was seen by cardio-vascular surgeon, Dr. Deeik,
and after lengthy discussions with Dr. Dassah, it was determined that by-pass surgery was the
safest way to proceed.  (Id.)

Later on May 11, 2009, Dr. Dassah performed a single vessel coronary artery
bypass, assisted by Dr. Klingman.  (Id.)  Plaintiff tolerated the procedure well and was
transferred to the ICU without complications.  (Id.)

On May 14, 2009, plaintiff was discharged in stable condition to California State
Prison-Solano ("CSP-Solano").  (Id.)

On or about July 15, 2009, plaintiff underwent an echocardiogram at defendant
Queen of the Valley Hospital which revealed that he had moderate left ventricular dysfunction
with a decreased ejection fraction of 30-35% with global hypokinesis (diminished movement of
the heart).  (Id. at 58-59.)   The left ventricular ejection ("LVEF") in a healthy person is 55-70%.
(Id. at 59.)  Patients with ejection fractions of 40-45% have mildly depressed ejection fractions.
(Id.)  Patients with ejection fractions of 30-40% have moderately depressed ejection fractions.
(Id.)  In general, the lower the patient's ejection fraction, the worse the prognosis.  (Id.)  Patients
with ejection fractions of less than 35% have a substantial increase in incidents of sudden cardiac
death.  (Id.)

On or about September 11, 2009, a physician request for services was submitted at
CDCR for plaintiff to receive an implantable cardioverter defibrillator ("ICD") (a device similar

to a pacemaker).  (Id.)  In the request, it was noted that plaintiff had a LVEF of 30% based on the July 2009 study.  (Id.)  This was indicative of ischemic cardiomyopathy (when the heart's ability to pump blood is decreased because the left ventricle is enlarged, dilated or weak).  (Id.)  It was also noted that plaintiff had undergone coronary artery bypass graft surgery in May 2009.  (Id.)

On September 25, 2009, plaintiff had an electrocardiogram (a test that records the heart's electrical activity), which revealed an age-indeterminate heart attack.  (Id.)  The test also revealed lateral T Wave (representing ventricular repolarisation) changes, which were likely due to myocardial ischemia.  (Id.)

On or about September 27, 2009, plaintiff had a consultation with Dr. Dassah regarding implantation of a defibrillator.  Plaintiff's latest ejection fraction was about 30% and plaintiff was experiencing dizziness and fainting episodes.  Dr. Dassah suspected that plaintiff had premature ventricular contraction ("PVC").  The low ejection fraction met the criteria of the Multicenter Automatic Defibrillator Implantation Trial II ("MADIT-II), a trial which showed the lifesaving benefits of defibrillators.  Dr. Dassah recommended that plaintiff be admitted to defendant NorthBay for implantation of the defibrillator for primary prevention.

On or about September 28, 2009, Dr. Dassah performed an implantation of the implantable cardioverter defibrillator on plaintiff at defendant Northbay.  (Id. at 60.)  The procedure was uneventful, and the defibrillator was tested by E. Nelson, a technician from Boston Scientific.  (Id.)  On or around September 29, 2009, plaintiff was doing well after the procedure and the defibrillator was functioning normally.  (Id.)  Dr. Dassah ordered that plaintiff could be discharged from defendant NorthBay to CSP-Solano.  (Id.)

On or around February 12, 2010, an urgent physician request for services was submitted to CDCR for plaintiff to undergo cardiac catheterization.  (Id. at 61.)  It was noted in the request that a cardiac nuclear imaging scan (a test which shows how well blood flows to the heart) conducted on October 10, 2009, revealed moderate ischemia (reduced blood flow to the heart).  (Id.)

On or about February 26, 2010, plaintiff was admitted by Dr. Dassah to defendant NorthBay for cardiac catheterization because of chest discomfort and an abnormal nuclear stress test.  (Id.)  Dr. Dassah performed the procedure without complications.  (Id.)  The left coronary artery showed good blood flow without occlusive or pre-occlusive lesions (blockages).  (Id.)  However, the right coronary artery was totally occluded, but the saphenous vein graft to the posterior descending branch was lively patent with good flow (meaning that the bypass surgery had been effective).  (Id.)  The result of the coronary angiography showed good global left ventricular blood flow, and Dr. Dassah continued medical therapy (which meant that no further coronary procedures were necessary).  (Id.)

C.  Analysis – Eighth Amendment Claim

1.  Are Defendants State Actors?

At the outset, the undersigned must address whether defendants are state actors subject to liability under 42 U.S.C. § 1983

An essential element of an action brought under 42 U.S.C. § 1983 is that the defendant accused of violating the plaintiff's constitutional rights acted under color of state law.  See Gomez v. Toledo, 446 U.S. 635, 640 (1980).  Actions taken by private individuals or organizations may be under color of state law "if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295-96 (2001) (internal quotation and citation omitted).  Here, defendants do not dispute that they were acting under color of state law at the time plaintiff received treatment in their facilities.  Accordingly, for the purpose of these findings and recommendations, the undersigned assumes that defendants are state actors.

A plaintiff suing a municipality or private entity performing a state function must state facts meeting the test articulated in Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 691-94 (1978).  Under Monell, requisite elements of a § 1983 claim against a

municipality or private entity performing a state function are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  See Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs., 237 F.3d 1101, 1110-11 (9th Cir. 2001) (citing Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996) (internal quotation marks omitted)).

       2.  Was Plaintiff Deprived of a Constitutional Right?

       *Legal Standard for Eighth Amendment Claim*

       Generally, deliberate indifference to a serious medical need presents a cognizable claim for a violation of the Eighth Amendment's prohibition against cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  According to Farmer v. Brennan, 511 U.S. 825, 847 (1994), "deliberate indifference" to a serious medical need exists "if [the prison official] knows that [the] inmate [ ] face[s] a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  The deliberate indifference standard "is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'"  McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (quoting Hudson v. McMillian, 503 U.S. 1, 6 (1992)), overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997). Specifically, a determination of "deliberate indifference" involves two elements:  (1) the seriousness of the prisoner's medical needs; and (2) the nature of the defendant's responses to those needs.  McGuckin, 974 F.2d at 1059.

       First, a "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id. (citing Estelle, 429 U.S. at 104).  Examples of instances where a prisoner has a "serious" need for

medical attention include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. McGuckin, 974 F.2d at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

Second, the nature of a defendant's responses must be such that the defendant purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for "deliberate indifference" to be established. McGuckin, 974 F.2d at 1060. Deliberate indifference may occur when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison physicians provide medical care. Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988). In order for deliberate indifference to be established, there must first be a purposeful act or failure to act on the part of the defendant and resulting harm. See McGuckin, 974 F.2d at 1060. "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." Id. Second, there must be a resulting harm from the defendant's activities. Id. The needless suffering of pain may be sufficient to demonstrate further harm. Clement v. Gomez, 298 F.3d 898, 904 (9th Cir. 2002).

Mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). However, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

In order to defeat defendants' motion for summary judgment, plaintiff must "produce at least some significant probative evidence tending to [show]," T.W. Elec. Serv., 809

F.2d at 630, that defendants' actions, or failures to act, were "in conscious disregard of an

excessive risk to plaintiff's health," Jackson v. McIntosh, 90 F.3d at 332 (citing Farmer, 511 U.S.

at 837).

*Analysis – Treatment at Defendant Queen of the Valley Hospital*

Defendants argue that they are entitled to summary judgment because the conduct

of their independent contractors at defendant Queen of the Valley Hospital did not violate the

Eighth Amendment.  As discussed above, plaintiff alleges that he suffered injuries as a result of

the angioplasty performed at defendant Queen of the Valley Hospital that forced doctors to

perform an emergency by-pass operation.

Defendants argue that the treatment plaintiff received in May 2009 at defendant

Queen of the Valley Hospital was appropriate.  Defendants have presented expert evidence that

the angioplasty procedure performed on plaintiff by Dr. Dassah on May 10, 2009, was medically

appropriate.  In particular, defendants have submitted the declaration of Dr. Earl Holloway, a

physician who is board certified in internal medicine, cardiovascular disease and interventional

cardiology.  (Dkt. No. 27-4 at 55.)  Based on his review of plaintiff's medical records, Dr.

Holloway found that the treatment provided by Dr. Dassah was appropriate:

> 12.  In my professional medical opinion, it was medically
> appropriate for Dr. Dassah to recommend and perform the cardiac
> catheterization and angioplasty on May [10], 2009 because
> percutaneous coronary intervention is the appropriate treatment for
> acute coronary syndromes (resting chest pain) and single vessel
> coronary disease.
>
> 13.  Further, in my professional medical opinion, the cardiac
> catheterization and angioplasty procedures were performed within
> the appropriate standard of care.  Although Wicklund suffered a
> spiral dissection of the right coronary artery during the angioplasty,
> the dissection was not due to any departure from the standard of
> care by Dr. Dassah.  The affected area of the artery had significant
> tortuosity, which made the angioplasty very difficult.  Dissections
> of the artery are known complications associated with angioplasty.
> According to the records, this risk was explained to Wicklund and
> he agreed to go ahead with the procedure.  Once the dissection
> occurred, Dr. Dassah  appropriately called in Dr. Srebro to assist
> him in the complicated procedure.  Their decision not to proceed

1    with further stent placement was also medically appropriate.  The
2    artery was open and Wicklund was stable at the conclusion of the
     procedure.

3    14.  In my professional opinion, it was also medically appropriate
4    for Dr. Dassah and Dr. Deeik to recommend coronary artery bypass
     grafting to Wicklund because the less invasive angioplasty
     procedure was not successful due to the tortuous nature of
5    Wicklund's artery.  The bypass was performed within the
     appropriate standard of care by Dr. Deeik and Dr. Klingman.
6    Wicklund did not suffer any injury as a result of the procedure.

7    (Dkt No. 27-4 at 58.)

8              Defendants' expert evidence demonstrates that Dr. Dassah first attempted to

9    perform the angioplasty, a less invasive procedure than the bypass.  The angioplasty on plaintiff

10   would be difficult because of the significant tortuosity of plaintiff's artery.  A known

11   complication, i.e., dissection, occurred during the procedure.  Following the dissection, Dr.

12   Dassah called Dr. Srebro for assistance.  Dr. Srebro was unable to place the stent because of the

13   tortuosities in plaintiff's artery.  After the angioplasty was unsuccessful, it was determined that

14   plaintiff should undergo a bypass operation.  Defendants' expert evidence demonstrates that the

15   treatment he received by defendant Queen of the Valley Hospital's independent contractors in

16   connection with his angioplasty and bypass operation did not constitute deliberate indifference.

17   Rather, defendants' expert evidence demonstrates that plaintiff's treatment was medically

18   appropriate and within the standard of care.

19             Plaintiff has presented no expert evidence supporting his claim that the treatment

20   he received from Dr. Dassah or any other doctor in connection with his angioplasty and bypass

21   operation demonstrated deliberate indifference or was otherwise inappropriate.  Accordingly,

22   based on defendants' unopposed expert evidence, the undersigned finds that defendant Queen of

23   the Valley Hospital should be granted summary judgment as to plaintiff's Eighth Amendment

24   claim on grounds that no constitutional violation occurred.

25             *Analysis – Treatment at Defendant NorthBay*

26             Defendants argue that they are entitled to summary judgment because the conduct

16

1   of their independent contractors at defendant NorthBay did not violate the Eighth Amendment.

2   As discussed above, plaintiff alleges that when he was taken to defendant NorthBay on

3   September 28, 2009, he did not know what procedure was to be performed until after surgery.

4   Plaintiff further alleges that implantation of the defibrillator has made his condition more severe.

5   Plaintiff also suggests that implantation of the defibrillator was unnecessary and experimental.

6          In his opposition, plaintiff states that he signed consent forms at defendants'

7   facilities and that "this is not in question." (Dkt. No. 33 at 5.)  Defendants have provided a copy

8   of the consent form plaintiff signed for implantation of the defibrillator.  (Dkt. No. 27-5 at 18-

9   20.)  Defendants have also submitted a report prepared by Dr. Dassah on September 28, 2009,

10  stating that he explained the risks and benefits of the procedure, and plaintiff agreed to have the

11  procedure done.  (Dkt. No. 27-4 at 98.)  For these reasons, the undersigned need not address

12  plaintiff's claim that he did not know what procedure was to be performed on September 28,

13  2009, until after the surgery was performed.

14         Defendants have presented expert evidence that implantation of the defibrillator

15  was medically necessary.  In his declaration Dr. Holloway addresses this issue:

16             24.  In my professional medical opinion, the implantation of the
               implantable cardioverter defibrillator ("ICD") performed by Dr.
17             Dassah on September 28, 2009 was medically necessary.  In
               particular, the procedure was necessary because Wicklund had
18             decreased left ventricle function as evidenced by an ejection
               fraction of less than 35%, which is associated with a substantial
19             increase in the risk of sudden cardiac death.

20  (Id. at 61.)

21         Plaintiff has presented no expert evidence demonstrating that implantation of the

22  defibrillator was improper or made his condition worse.  In his opposition, plaintiff argues that at

23  least four other inmates receiving the same defibrillator had it removed because it was "uncalled

24  for." (Dkt. 33 at 4.)  Plaintiff also alleges that he recently saw a television show discussing the

25  recall of what plaintiff believes is the same defibrillator as he received.  (Id.)  These arguments

26  do not demonstrate that implantation of the defibrillator in plaintiff was improper or caused him

17

1    harm.

2              In his opposition, plaintiff argues that the fact that a technician from the

3    pacemaker company was present at the time Dr. Dassah installed the defibrillator demonstrates

4    that Dr. Dassah was not entirely familiar with the installation process.  In his declaration, Dr.

5    Holloway stated that E. Nelson, a technician from Boston Scientific (the company that

6    manufactured the pacemaker), was present during installation of the pacemaker and tested it after

7    it was installed.  (Dkt. No. 27-4 at 60.)  The fact that a technician from the pacemaker company

8    was present when it was installed does not demonstrate that Dr. Dassah was not familiar with the

9    installation process.

10             It appears that plaintiff's argument that he was subject to experimental surgery

11   may be based on the fact that the pacemaker was installed after Dr. Dassah found that plaintiff

12   met the criteria for the Multicenter Automatic Defibrillator *Trial II* ("MADIT II") (emphasis

13   added).  According to defendants, the MADIT II trial showed the lifesaving benefits of

14   defibrillators.  Plaintiff's claim that he was a "guinea pig" may be based on his perception that he

15   was part of defibrillator study.

16             As discussed above, plaintiff consented to implantation of the defibrillator.  In

17   addition, defendants have presented evidence that Dr. Dassah discussed the procedure with

18   plaintiff,  explaining the risks and benefits.  Plaintiff's consent to the procedure, which was

19   explained to him, undermines his claim that he was a "guinea pig."  In addition, plaintiff has

20   presented no expert evidence that the fact that he met the criteria for the MADIT II demonstrates

21   that implantation of the defibrillator  constituted experimental surgery.  Finally, plaintiff has

22   presented no expert evidence demonstrating that he suffered any injury as a result of implantation

23   of the defibrillator.  The lack of injury further undermines his claim that implantation of the

24   device was experimental.

25             In his opposition, plaintiff suggests that because defendant NorthBay permits

26   some experimental surgeries, implantation of his defibrillator was experimental.  Plaintiff has

18

1    presented no evidence to support this claim.  Moreover, it is not reasonable to infer from the fact

2    that defendant NorthBay permits some experimental surgeries that implantation of plaintiff's

3    defibrillator was experimental.

4            Based on defendants' unopposed expert evidence, the undersigned finds that

5    defendant NorthBay should be granted summary judgment as to plaintiff's Eighth Amendment

6    claim on grounds that no constitutional violation occurred.

7            3.  Were Defendants' Policies a Moving Force Behind Any Constitutional

8            Violation?

9            Defendants argue that even assuming, arguendo, that plaintiff could establish an

10   underlying constitutional violation, the evidence demonstrates that any such violation was not the

11   result of any policy or custom of either defendant.

12           *Defendant Queen of the Valley Policies*

13           Plaintiff alleges that defendant Queen of the Valley Hospital has a policy that

14   permits unqualified surgeons to perform surgery on inmates.  Defendants argue that defendant

15   Queen of the Valley does not have a policy that permits physicians with staff privileges to

16   provide medical care to patients, including CDCR inmates, that falls below the professional

17   standard of care.

18           As discussed above in the section setting forth the undisputed facts, all

19   applications for medical staff at defendant Queen of the Valley Medical Hospital go through a

20   strict credentialing and re-credentialing process before being granted privileges.  Plaintiff has

21   presented no evidence in support of his claim that defendant Queen of the Valley Hospital has or

22   had a policy that permitted unqualified surgeons to perform surgery on inmates.

23           Because the evidence demonstrates that no constitutional violation occurred as a

24   result of any policy or custom of defendant Queen of the Valley Hospital, defendant Queen of the

25   Valley Hospital should be granted summary judgment.

26   ////

1        *Defendant NorthBay Policies*

2            Plaintiff alleges that defendant NorthBay had a policy of permitting doctors to

3    perform experimental or unnecessary surgery.  Defendants argue that defendant NorthBay did not

4    have a policy that permitted doctors to perform experimental or unnecessary surgery.

5            As discussed above in the section setting forth the undisputed facts, defendant

6    NorthBay also has a strict credentialing process for medical staff before they are granted

7    privileges.  In addition, defendant NorthBay permits experimental surgeries only after the

8    Institutional Review Board reviews and approves the proposed procedure.

9            Because the evidence demonstrates that no constitutional violation occurred as a

10    result of any policy or custom of defendant NorthBay, defendant NorthBay should be granted

11    summary judgment.

12            D.  State Law Claims

13            Plaintiff argues that defendants committed medical malpractice in violation of

14    state law.  Defendants' summary judgment motion addresses the merits of plaintiff's state law

15    claims.

16            Where the court "has dismissed all claims over which it has original jurisdiction,"

17    the court "may decline to exercise supplemental jurisdiction" over plaintiff's state law claims.

18    See 28 U.S.C. § 1367(c).  The Ninth Circuit has held that these provisions give federal courts

19    discretion either to retain or to dismiss a case after all federal claims have been dismissed.

20    Albingia Versicherungs AG v. Schenker Int'l, 344 F.3d 931, 937–38 (9th Cir. 2003).  When

21    determining whether to retain supplemental jurisdiction, the court is guided by the values "of

22    economy, convenience, fairness, and comity."  Acri v. Varian Assocs., 114 F.3d 999, 1001 (9th

23    Cir. 1997) (en banc) (quoting Allen v. City of Los Angeles, 92 F.3d 842, 846 (9th Cir. 1996))

24    (internal quotation marks omitted).

25            Because the undersigned has recommended that defendants be granted summary

26    judgment as to plaintiff's constitutional claims, he recommends that the court exercise its

1  discretion and decline to exercise jurisdiction over plaintiff's state law claims.  For these reasons,

2  the undersigned need not address the merits of plaintiff's state law claims.

3  IV.  Request for Appointment of Counsel

4          In his opposition to defendants' summary judgment motion, plaintiff requests the

5  appointment of counsel.

6          The United States Supreme Court has ruled that district courts lack authority to

7  require counsel to represent indigent prisoners in § 1983 cases.  Mallard v. United States Dist.

8  Court, 490 U.S. 296, 298 (1989).  In certain exceptional circumstances, the court may request the

9  voluntary assistance of counsel pursuant to 28 U.S.C. § 1915(e)(1).  Terrell v. Brewer, 935 F.2d

10  1015, 1017 (9th Cir. 1991); Wood v. Housewright, 900 F.2d 1332, 1335-36 (9th Cir. 1990).

11          While the medical issues in this case are not simple, based on defendants'

12  persuasive evidence the undersigned finds that appointment of counsel is not warranted.

13  Therefore, plaintiff's request for the appointment of counsel is denied.

14          Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for appointment

15  of counsel (Dkt. No. 33) is denied; and

16          IT IS HEREBY RECOMMENDED that defendants' summary judgment motion

17  (Dkt. No. 27) be granted.

18          These findings and recommendations are submitted to the United States District

19  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

20  one days after being served with these findings and recommendations, any party may file written

21  objections with the court and serve a copy on all parties.  Such a document should be captioned

22  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

23  objections shall be filed and served within fourteen days after service of the objections.  The

24  ////

25  ////

26  ////

parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  August 24, 2012

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

wick2161.sj(2)